FOR PUBLICATION

FILED
JAMES J. WALDRON, CLERK
DECEMBER 3, 2013

U.S. BANKRUPTCY COURT
NEWARK, NJ

By:   /s/ Margaret Cohen
Deputy

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Case No.:        12-12906  (MS) |
| CHRIST HOSPITAL, a New Jersey not-for-profit corporation, | Chapter 11 |
| Debtor. | |

# **O P I N I O N**

## APPEARANCES

**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
Louis A. Modugno, Esq.
1300 Mount Kemble Avenue
P.O. Box. 2075
Morristown, NJ  07962-2075

*Counsel to Hudson Hospital Propco, LLC, Hudson Hospital Opco, LLC, Hudson Hospital Holdco, LLC and Vivek Garipalli*

**McCUSKER, ANSELMI, ROSEN & CARVELLI, P.C.**
Bruce S. Rosen, Esq.
210 Park Avenue, Ste. 301
Florham Park, NJ  07932
-and-
**LAW OFFICES OF WILLIAM S. KATCHEN, LLC**
210 Park Avenue, Ste. 301
Florham Park, NJ  07932

*Counsel to Prime Healthcare Services, Inc.*

**HONORABLE MORRIS STERN, Bankruptcy Judge**

## I.      FACTUAL BACKGROUND.

Movant here (collectively "Hudson")[1] was the successful bidder in bankruptcy for

essentially all of the assets of Chapter 11 debtor Christ Hospital, a New Jersey not-for-profit

---
[1] Hudson includes Hudson Hospital Propco, LLC, Hudson Hospital Opco, LLC, Hudson Hospital Holdco, LLC and Vivek Garipalli, a principal of and alleged major stakeholder in the Hudson entities.

corporation (the "hospital" or the "debtor").  The sale, pursuant to a court-ordered auction

process, was approved by order of this court on March 27, 2012 (the "Sale Approval Order").

That Order provided Hudson with what it contends are the benefits of broad "free and clear"

protections as a purchaser of hospital assets per 11 U.S.C. § 363(f).[2]  Hudson now seeks to

enjoin Prime Healthcare Services, Inc. ("Prime") from pursuing its pending lawsuit against

Hudson in the New Jersey Superior Court (the "State litigation").  There Prime asserts remaining

active claims of "Tortious Interference in Contractual Relations," "Tortious Interference with

Prospective Economic Gain" and "Unfair Competition" relating to Hudson's acquisition of

hospital assets but with origins before the hospital filed its February 6, 2012 voluntary Chapter

11 bankruptcy petition.[3]   Hudson asserts, *inter alia*, that the Sale Approval Order and this

court's order confirming the hospital's plan of liquidation (the "Confirmation Order") are being

collaterally attacked and violated by Prime's pursuit in the State litigation.  Hudson relies heavily

on *res judicata* and collateral estoppel concepts.  Prime, as Hudson sees it, should thus be

enjoined from continuing that litigation.  In fact, sale-related injunctions inuring to the benefit of

the successful § 363 sale bidder were included in the Sale Approval Order and the Confirmation

Order.

---

[2] 11 U.S.C.§ 363(f) is as follows:

> (f) The trustee may sell property under subsection (b) or (c) of
> this section free and clear of any interest in such property of an
> entity other than the estate, only if--
>     (1) applicable nonbankruptcy law permits sale of such
> property free and clear of such interest;
>     (2)  such entity consents;
>     (3) such interest is a lien and the price at which such
> property is to be sold is greater than the aggregate value of all
> liens on such property;
>     (4)  such interest is in bona fide dispute; or
>     (5)  such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

[3] The basic factual background documented in portions of the parties' motion-related submissions and in
the docket of this Chapter 11 case appears to be uncontroversial and is relied upon herein.

Prime filed opposition to Hudson's motion for an injunction and a cross-motion to have the reference withdrawn by the district court pursuant to 28 U.S.C. § 157(d), thus allowing that court to hear the current disputes. Prime argues that none of the following gives the bankruptcy court subject matter jurisdiction over Prime's state law claims: any order entered in the bankruptcy case; 28 U.S.C. § 1334(b); United States Supreme Court cases which otherwise restrict bankruptcy court jurisdiction or the ability of this court to enter final judgments;[4] or, 11 U.S.C. § 105(a) (bankruptcy court power to issue orders "necessary or appropriate" to carry out provisions of Title 11 or enforce its orders). Prime also argues that no bankruptcy court order precludes Prime's State litigation claims under collateral estoppel or *res judicata*.

Contesting Hudson's position and the precedent it relies on, Prime asserts:

> Here, the Bankruptcy Court did not hear evidence, consider, or make findings on Prime Healthcare's claims against [Hudson] for Prime's state court claims. These issues were not adjudicated or litigated in the Bankruptcy Court, and were not required to be determined by the Bankruptcy Court. Simply, [Prime's] state law claims involving multiple hospitals in multiple states are separate and apart from the Christ Hospital Bankruptcy Proceeding. . . .

> [Hudson] relies on the case In re Farmland Industries, Inc., 376 B.R. 718, 725-26 (Bnkr.W.D. Mo. 2007) [sic], aff'd, 639 F.3d 402 (8th Cir. 2011) for the proposition that an unsuccessful bidder asserting post-sale tortious interference claims is not permitted to collaterally attack a bankruptcy sale order because it would require "overruling numerous findings from the Sale Orders." Id. at 727. However, this case is factually inapposite to the instant matter.[5]

---

[4] *See Stern v. Marshall*, 131 S. Ct. 2594, *reh'g denied*, 132 S. Ct. 56 (2011); *Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990); *Granfinanciera v. Nordberg*, 492 U.S. 33 (1989); *Northern Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50 (1982); Katchen *v. Landy*, 382 U.S. 323 (1966).

[5] Prime continues:

> In Farmland, the Court dismissed a tortious interference claim by an unsuccessful bidder that was entirely based upon the conduct of the debtor and the successful bidder during the sale process, including allegations that they colluded to mislead the bankruptcy court "into believing that the sale . . . was a good deal which should be approved quickly and without close

. . . .

> Here, [Prime's] claims in no way relate to [Hudson's] conduct
> during the Christ Hospital bankruptcy sale process, nor does
> [Prime's]   Superior Court Complaint allege misconduct in
> connection with the Bankruptcy Proceedings.   Rather, [Prime's]
> state law claims   relate solely to   [Hudson's] pre-petition,
> pre-bidding conduct  involving Christ  Hospital. These claims are
> wholly unrelated to the Bankruptcy Proceeding and the Bankruptcy
> Court's determination that [Hudson] was a "good faith" purchaser.

(Dkt. 1302, Prime's *Memorandum of Law* in support of its cross-motion and in opposition to

Hudson's motion for an injunction.)  As will be seen, this court acknowledges a certain degree of

relevance of *Farmland*, but finds no need to rely heavily on that opinion for factual or conceptual

support.

At outset and most fundamentally, this court disagrees with Prime's characterization of

its economic tort claims – they are quite obviously intertwined with this Chapter 11 case.

Indeed, Prime's convenient current statement that its tort claims do not encompass any Hudson

misconduct "in connection with" the bankruptcy or its sale proceeding flies in the face of its own

State litigation pleadings; a "forced" bankruptcy is alleged *and*, having supposedly driven Prime

from the marketplace by unfair competitive practices, Hudson is said to have acquired the Christ

Hospital assets for a diminished price.  Moreover, the "missing" bankruptcy hearing on Prime's

remaining economic tort claims was solely a function of Prime's silence.  Those claims, which

are independent of later market competition between Prime and Hudson for *other* hospitals, had

manifested as of the time of the § 363 sale.  *However, only Prime was in a position to be aware*

---

scrutiny."  Id. (emphasis added).  The Farmland Court held that
the tort claims were a collateral attack on the approved sale and
barred by the doctrine of collateral estoppel in light of the court's
finding that the successful bidder had acted in good faith under
section 363(m) of the Bankruptcy Code.  Id

*of its status as a potential tort claimant.*[6]  While Prime was not required to voice its objection to

the sale in bankruptcy, it was put to the burden as a knowing claimant to object or risk loss of its

claim to a necessarily accelerated bankruptcy process (with broad orders of process protection).

The cross-motion to withdraw the reference was transmitted to district court pursuant to

D.N.J. LBR 5011-1; hearing on this withdrawal motion was eventually adjourned at Prime's

request, pending resolution by the bankruptcy court of Hudson's motion.   Prime had filed with

the bankruptcy court (pursuant to Fed. R. Bankr. P. 5011(c)) a motion to stay the hearing on

Hudson's motion for an injunction until the district court's resolution of Prime's motion to

withdraw the reference.  This court denied Prime's motion for a stay for the reasons set forth on

the record, and heard extensive oral argument on Hudson's motion.

The Parties.  Prime's complaint describes Prime as a major operator of for-profit acute

care hospitals (sixteen in California, Nevada, Pennsylvania and Texas).  It also operates

not-for-profit hospitals in California and Texas through a charitable foundation.  Its hospital

employees total more than 16,000.  Hudson owns and operates three for-profit hospitals

(including the successor to Christ Hospital) in Hudson County, New Jersey.

Prepetition Events/Reasons for Chapter 11 Filing.  In its Disclosure Statement dated

April 23, 2013 the debtor describes as follows certain events leading up to this case (some of

---

[6] Prime, a substantial enterprise experienced in the competitive for-profit hospital marketplace, was fully aware at the time of the bankruptcy sale of the facts ultimately pled in its Christ Hospital-related economic tort claims.  Therefore, while one cannot specifically account for Prime's perception of its claims, including the timing of when it believed it had a legally cognizable action, this court concludes that Prime (in its view) knew that it had been wronged by Hudson as the Chapter 11 case was filed. Moreover, at the time Hudson became the successful auction bidder, Prime must be charged with the knowledge that the proposed (and later issued) Sale Approval Order would affect Prime's perceived causes.  And, nothing in the record indicates that as of the bankruptcy sale, Hudson had been made aware of Prime's perceived causes.   It is with these underpinnings that the point is made throughout this opinion:  *only* Prime was, at the time of the bankruptcy sale, aware of its position as a potential tort claimant against Hudson as the successful bidder.   This point is undisturbed by any assertion that the State litigation was largely a reaction by Prime to *later* marketplace conduct by Hudson as to *other* hospitals.

which parallels factual statements in Prime's State litigation complaint) (*Disclosure Statement*,

dkt. 1172, pp. 8-11, including quoted and synopsized passages).

Debtor's earliest contact with Prime was June, 2011. "Debtor entered into a Letter of Intent on August 12, 2011 (the "LOI") with Prime . . . followed by a December 2, 2011 asset purchase agreement (the "Prime APA")."

"As of the date the Debtor executed the LOI with Prime, and given the Debtor's application to terminate the pension plan, the Debtor owed approximately $90,000,000 to the Pension Benefit Guaranty Corporation ("PBGC") and the Internal Revenue Service ("IRS"), $12,700,000 to Bon Secours Health System ("Bon Secours"), and $20,000,000 to other unsecured creditors, for total balance sheet liabilities on these three items alone of $122,700,000. . . ."

"With Prime's support, the Debtor was able to borrow an additional $5,600,000 on its line of credit with HFG (defined below) because of Prime's agreement to participate in that transaction. As part of this, the Debtor resolved the Bon Secours claim of $12,700,000 for $1,100,000, which was funded by Prime through the HFG line and paid on September 1, 2011 . . . ."

. . . .

"On September 14, 2011. . . the Debtor filed its notice under the Community Healthcare Asset Protection Act ("CHAPA") with the Attorney General. On September 30, 2011, Prime filed its Certificate of Need ("CON") Application with the DOH [New Jersey Department of Health]."

"In connection with Charity Care advances made by the DOH in the 4th quarter of 2011, the DOH had required that the Debtor present the executed Prime APA prior to the December, 2011 advance, which the Debtor did on December 2, 2011. Thereafter, the State released the requested Charity Care advance."

. . . .

"The Debtor invited the unsecured creditors to form an unofficial committee, which they did . . . The Unofficial Committee retained its own restructuring attorneys and financial advisors, and in the spirit of cooperation, the Debtor funded those advisors an initial retainer of $150,000."

. . . .

6

"On December 23, 2011, and despite the fact that it was under an exclusive agreement with Prime, the Debtor received an unsolicited offer to purchase its assets from Hudson Hospital Holdco, LLC ("Hudson"), an affiliate of the entity that had purchased both Bayonne Medical Center and Hoboken University Medical Center out of bankruptcy."

"On January 20, 2012, the Debtor received an unsolicited offer to purchase its assets from Community Healthcare Associates ("CHA"), the entity that had purchased Barnert Hospital out of bankruptcy.  CHA's proposal was joined in by Jersey City Medical Center/Liberty Health, who would become a tenant for a portion of the Hospital premises if CHA was selected as the successful purchaser."

"Following these two expressions of interest, a significant amount of "public opinion" arose over who would be the best suitor for the Hospital.  Notwithstanding, the Debtor and its Board remained committed, not just contractually, but in accordance with its best business judgment, to proceed forward to close on the Prime APA."

. . . .

"On or about January 12, 2012, the Debtor received two discouraging pieces of news: first, that the State's second quarter Charity Care advance would not be forthcoming in the first Quarter, and second, that it did not seem likely that the Debtor's CHAPA or Prime's CON applications, commenced in September of 2011 would be finalized until May or June, well into the second Quarter of 2012, and well beyond Prime's then desired closing date of March 31, 2012."

"Prime interpreted this news (rightly or wrongly) to mean that the State was not supporting the Prime transaction . . ."

"On January 25, the Debtor received word that its request for reconsideration by DOH [regarding Charity Care funds] had been denied.  On January 26, 2012 . . . Prime advanced the Debtor an additional $1 million through the HFG line, which enabled the Debtor to meet its January 27 payroll."

"On Tuesday, January 31, 2012, Prime advised the Debtor that it would withdraw its bid and no longer finance the Debtor's operations by backstopping the HFG line."

<u>Prime's Appearance in this Chapter 11 Case; Case References to Prime</u>.  The day after the February 6, 2012 petition filing the debtor moved for approval of post-petition financing and use of cash collateral.  Its prepetition secured lenders appeared through HFG Health Co-4, LLC ("HFG" or "HF-4") as their agent (*Motion for an Interim Order*, dkt. 12), which remained a very active participant in the case.  The debtor stipulated in the February 7, 2012 Interim Order for post-petition financing and the use of cash collateral that HF-4 was the only prepetition lender on the debtor's revolving loan and the debtor's term loan (*Interim Order*, February 7, 2012, dkt. 29, ¶¶ B.1 and B.6) ("Interim Order").  Because of Prime's prepetition loans to the debtor, Prime retained an interest in the term loan debt.  In relevant part the Interim Order provided:

> As of the Filing Date, HFG was the only Prepetition Term Lender.  However, *as of the Filing Date, Prime Healthcare Services, Inc. holds certain last-out participation interests in the Prepetition Term Loan Debt in the approximate amount of $5.6 million.*  [Emphasis added.]

(Dkt. 29, ¶ B.6).  *Prime, through counsel, filed a Notice of Appearance on February 7, 2012* (dkt. 30) but did not file a proof of claim independent of that of HFG.  The court approved Bid Procedures by Order entered on February 22, 2012 (dkt. 98), and an auction was conducted over a number of days (March 19-26).  Prime did not submit a bid.  The court held a hearing to approve the sale on March 23, 2012 and March 27, 2012 which culminated in the Sale Approval Order of March 27, 2012.  Prime did not appear at the hearings to approve the sale.

<u>State Litigation</u>.    On March 13, 2013 Prime initiated the State litigation.  It is noteworthy that up to this time Prime could have sought to avail itself of Fed. R. Bankr. P. 9024 (*see* Fed. R. Civ. P. 60(b)), seeking relief from the terms of the Sale Approval Order of March 27, 2012.  No such effort was made, nor was any recourse by way of a request for interpretation or otherwise sought by Prime in the bankruptcy court, notwithstanding the persisting Sale Approval Order injunctive provisions.  Prime instead chose, in Hudson's view, to collaterally attack that order.

Substantial portions of Prime's complaint allege claims for anticompetitive acts of Hudson *post-petition* (indeed, after the sale to Hudson was concluded) as to Prime's efforts to acquire *other* New Jersey hospitals, i.e., St. Michael's and St. Mary's (as well as a Rhode Island hospital). Nevertheless, *both* linking the allegations against Hudson regarding Christ Hospital to those other purported anticompetitive acts (i.e., Hudson's supposed *modus operandi*) *and* complaining that Hudson had also damaged it as to Christ Hospital independent of the later anticompetitive events, Prime asserted:

> First Count (Violation of the New Jersey Anti-Trust Act, N.J.S.A. 56:9-3 – Conspiracy);
>
> Second Count (Violation of the New Jersey Anti-Trust Act, N.J.S.A. 56:9-4(a) – Monopoly);
>
> Third Count (Tortious Interference in Contractual Relations);
>
> Fourth Count (Tortious Interference with Prospective Economic Gain); and
>
> Fifth Count (Unfair Competition).

Much of the purported factual footing for Prime's Christ Hospital-based claims track the August 2011 to February 2012 history of Prime's negotiation and intense efforts to acquire the hospital's assets, including: its August 2011 Letter of Intent; more than $6 million of loans to keep the hospital afloat *and out of bankruptcy*; the December 2011 Prime-hospital Asset Purchase Agreement; then the Hudson unsolicited offer (through Hudson's principal, Garipalli) for hospital assets; and, ultimately the following:

> 18. Before and following that offer, Defendant Garipalli, individually, and through his entity Hudson Holdco, for the improper purpose of preventing and/or interfering with Prime Healthcare's purchase of Christ Hospital, organized and managed a campaign to destroy Prime Healthcare's reputation and undermine its ability to conduct business in New Jersey through the exertion of political influence and other non-public activities, the creation of alliances with

unions, other hospitals and others, and the transmission of misinformation concerning Prime Healthcare. In addition, it *was clear that Garipalli and Hudson Holdco's intent was to make it untenable for Prime Healthcare to continue to buy Christ Hospital in order to force it into bankruptcy so that Garipalli could purchase the struggling facility for less than what was agreed upon between Prime Healthcare and Christ Hospital in their APA*. [Emphasis added.]

19.   As a direct result of Garipalli and Hudson Holdco's actions, it became clear by February 2012 that Prime Healthcare's contractual opportunity to purchase Christ Hospital had been unfairly and irreparably destroyed by statements and actions made by these Defendants, as State authorities then made it clear that the purchase process would be so protracted as to be make the deal economically unfeasible, requiring Prime Healthcare to withdraw its offer to purchase.   *This immediately and predictably forced Christ Hospital into bankruptcy*.  [Emphasis added.]

20. Defendant Garipalli, through his entity Hudson Holdco, then immediately made an offer to buy Christ Hospital which was significantly less than what Prime Healthcare had offered, and the offer was deemed inappropriate by the trustees because the hospital would, pursuant to the bankruptcy code, need to be put up for auction for the benefit of creditors. Hudson Holdco later won a bankruptcy auction and according to the N.J. Attorney General's June 2012 review of the sale under the Community Health Care Assets Protection Act, the value of Prime Healthcare's total bid was approximately $80 million dollars, and the value of Hudson Holdco's bid in bankruptcy was about $70 million dollars, *about $10 million less than what it would have been had the hospital not been driven into bankruptcy by Hudson Holdco*.  [Part of emphasis in original; part emphasis added.]

*See, inter alia*, Prime's New Jersey Superior Court complaint ¶¶ 14-20.

Hudson moved in the New Jersey Superior Court for dismissal of the State litigation

based upon inadequacy of Prime's pleading.  *See* N.J. Court Rule 4:6-2(e).  That court ruled via

its opinion and order on August 22, 2013 (the "Superior Court Order" and the "Opinion").

Specifically, the court:

- dismissed without prejudice the First and Second Counts of the complaint (New Jersey statutory antitrust claims);

- dismissed without prejudice the Third, Fourth and Fifth Counts of the complaint (tortious interference and unfair competition) as they related to St. Mary's Hospital and St. Michael's Hospital; but

- *denied dismissal* of the Third, Fourth and Fifth Counts of the complaint as they related to Christ Hospital.

(Dkt. 1300, Hudson's motion, Exhibit C.)  The Opinion initially addressed antitrust claims but in terms later apparently applied to all counts, stated in relevant part as to both the state court "CHAPA" sale approval order *and* bankruptcy court orders the following:

> Allowing this litigation to proceed with respect to Christ Hospital would not constitute a collateral attack on the previous orders from the Bankruptcy Court or Superior Court.  *Those proceedings relate to the sale of Christ Hospital after it went into bankruptcy.  Plaintiff's antitrust claims pertain to defendants' actions that took place prior to, and allegedly during, this transaction.*  A finding by this court that Defendants engaged in illegal activity with respect to Christ Hospital would not necessarily conflict with the Superior Court findings which said that the bidding and process done in Bankruptcy Court was fair and competitive.   [The antitrust claims were nevertheless dismissed without prejudice on other grounds.]

> . . . .

> Defendants argue that the Bankruptcy Court order expressly relieves the successful bidder of liability on any theory of law or equity for claims relating to the Christ Hospital transaction. Paragraph U of the Sale Order specifically bars antitrust claims.  Again, this refers to the Christ Hospital transaction as conducted in the Bankruptcy Court, after foreclosure [the petition or sale date?].  *Therefore, claims against Defendants Holdco and Garipalli can be construed as independent of CHAPA-facilitated transaction because the alleged anticompetitive behavior was happening separately from, and prior to, those proceedings.*

> *This litigation is not seeking to undo the sale of Christ Hospital or challenge the outcome of the CHAPA proceedings.  Thus, the litigation with respect to Christ*

> *Hospital is not an impermissible collateral attack on the*
> *Bankruptcy Court or Superior Court orders.*

(*Id.* at Opinion, p.2., emphasis added.)  The Opinion goes on to assess Counts Three through

Five as pled.  As to Tortious Interference Counts Three and Four, the court opined:

> . . . Plaintiff's claims for tortious interference with
> respect to Christ Hospital are sufficient to survive the
> extreme measure of dismissal under the generous standards
> of notice pleading.   Here, Plaintiff has alleged that
> Defendants Garipalli and Holdco worked to create
> opposition to their acquisition of Christ Hospital, *forcing*
> *them to withdraw their bid*.  Prime has alleged facts which,
> at a minimum, put Defendants Garipalli and Holdco on
> notice that organizing opposition to Prime's acquisition of
> Christ Hospital at various levels, if proven to be true and
> illegal at a later stage in litigation, effectively *forced Prime*
> *out of the market for Christ Hospital and caused Prime*
> *financial loss*.   This is distinguishable from the tortious
> interference claims regarding St. Mary's and St. Michael's,
> where the alleged interference has not actually taken place.

(*Id.* at Opinion, p.5, emphasis added.)  The Count Five unfair competition claim was said to be

predicated on the same facts supporting the tortious interference counts.

   Current Status of Case.   In accordance with the Sale Approval Order (with Hudson's

signed APA attached) the sale of the assets of the hospital to Hudson closed on July 13, 2012.

The case remained fully active, with substantial post-closing administrative matters over the next

eleven months leading up to Plan confirmation.  The debtor and Committee filed a Disclosure

Statement and Joint Plan of Orderly Liquidation with a March 15, 2013 motion to approve the

former.[7]  The court approved the Disclosure Statement by Order of April 23, 2013.  By Order of

June 4, 2013 the court confirmed the Joint Plan of Orderly Liquidation.  Since the entry of the

Confirmation Order, there has been yet again substantial case activity (*see, e.g.,* dkt. 1214

through 1299).  Hudson then filed the instant motion on September 30, 2013.

---

[7] Prime filed its State litigation complaint on March 13, 2013.

<u>Relevant Bankruptcy Court Order Provisions; *In Rem* Character of Case and Proceedings</u>.

As referenced earlier, two orders of this court are of most significance to the current dispute:  the

Sale Approval Order of March 27, 2012, incorporating the Christ Hospital-Hudson Asset

Purchase Agreement, and the Confirmation Order of June 4, 2013, with the attached Joint Plan of

Orderly Liquidation.

The Sale Approval Order includes among its findings: that the "Successful Bidder," per

§ 363(m), "is a purchaser in good faith" (¶ K); that the Purchase Agreement is not the product of

collusion, and developed from arm's length bargaining positions (¶ L); that the hospital assets

may sell "free and clear of 'Liens and Claims'" per one or more of the § 363(f)(1)-(5)

requirements *and* that nonobjecting holders of such liens and claims are deemed to have

consented to the free and clear sale (¶ P);  that the transfer of assets at closing "will vest the

Successful Bidder . . . with all right, title, and interest in and to the Assets, free and clear of the

Liens and Claims. . . ." (¶ S); that "*an injunction against creditors and third parties pursuing the*

*Liens and Claims . . . is necessary to induce the Successful Bidder to close*" (¶ T, emphasis

added); and, that the transfer of assets to the Successful Bidder will not subject it to an expansive

array of liability, including liability on "any theory of law or equity" (¶ U).  These findings, in

turn, generated implementing decretal paragraphs, including among others: authorization for the

hospital to sell and transfer its assets per §§ 105, 363(b) and (f), "free and clear" of liens (as

broadly defined) and claims (again, as broadly defined), referencing the "claim" definition of

§ 101(5), and specifically including "causes of action and claims, to the fullest extent of the law

. . . *whether arising prior to, on, or subsequent to the Petition Date*. . . ." (¶ 5, emphasis added);

that the transfer of assets will not subject the Successful Bidder to a broadly stated array of

liability, and that "persons and entities . . . are forever barred, estopped, *and permanently*

*enjoined from asserting . . . Liens and Claims against the Successful Bidder Entities*" (¶ 6,

13

emphasis added); that this court retains exclusive jurisdiction to enforce the Sale Approval Order

(including the incorporated agreement), to interpret its provisions and hear "all issues and

disputes" including "*those concerning the transfer of the Assets free and clear of the Liens and*

*Claims*" (¶ 15, emphasis added); that "[e]ffective on the Closing Date . . . [those] . . . asserting

Liens and Claims . . . against the Debtor and/or any of the Assets are hereby *permanently*

*enjoined and precluded"* as to such Liens and Claims from *"commencing or continuing . . . any*

*action against the  Successful Bidder Entities. . .* (¶ 18, emphasis added); and, that § 363(m)

protections were ordered (¶ 24).

The Confirmation Order (largely through its attached Plan) essentially reaffirms the sale,

including the terms of the Sale Order and its incorporated asset purchase agreement (Plan

¶ 12.7).  Retention of jurisdiction by this court is likewise reiterated.  *See* Plan ¶ 11.1, including,

in particular, parts (j) and (k).  And, the Plan provides explicitly that "[a]ll *injunctions . . .*

*contained in the Sale Order and [Asset Purchase Agreement] shall remain in full force and effect*

*and binding on all parties and Creditors*."  Plan ¶ 12.2 (emphasis added).  These injunctions are

likewise supported by the Confirmation Order, ¶¶ 43, 44 and 77.

*Inter alia*, the Sale Approval Order and the reaffirming aspects of the Confirmation Order

are products of *in rem* proceedings (i.e., one per § 363 and the other being the case confirmation

itself) and as such affect or otherwise run with the asset transfer and the assets.[8]

Issues to be Decided.  Hudson claims the benefit of § 363 sale protection, *inter alia*

contending:  (i) Prime had an "interest" which could be (and was) affected by a "free and clear"

sale per § 363(f); (ii) having full notice and knowledge of the impending § 363(b) sale and the

proposed terms of its implementing order(s),  Prime failed to object to the sale terms and seek

---

[8]*In rem* bankruptcy jurisdiction is a fundamental in this case, and as to the embedded § 363(b) sale
proceedings in particular; references will be made throughout this opinion to *in rem* case characteristics.

protection for that interest in the case; and, (iii) Prime is now precluded from asserting its

interest.  Subsumed in these general propositions are the following issues:

(i)  Are the now-asserted economic torts "interests" in the assets sold to Hudson which, in

the contemplation of the Bankruptcy Code, could be affected by a "free and clear" sale per

§ 363(b) and (f)?

(ii)      If so, have the Bankruptcy Code requirements for a § 363(f) "free and clear" sale,

notice, and the availability of "adequate protection"[9] for Prime's interests been satisfied?

(iii)      If so, do specific bankruptcy court orders in the case preclude the current assertion

by Prime of rights based upon such interests?

(iv)      If the sale-related orders are deemed to be preclusive, does the State litigation

serve as a collateral attack on those orders, given that Prime's requested remedy is limited to

damages from Hudson?

(v)      If the sale-related orders are deemed to be preclusive, are they issued and

enforceable within the constitutional limits of bankruptcy court jurisdiction?

(vi)      Do the Anti-Injunction Act or the Superior Court Order and Opinion of August

22, 2013 limit the bankruptcy court in hearing and determining Hudson's motion?

## II.    PRIME'S REMAINING ACTIVE CLAIMS ARE "INTERESTS" WITHIN THE SCOPE OF § 363(f).

A major contention in Prime's defense against Hudson's motion to enjoin is that its

remaining active tort and unfair competition claims arose prepetition and as such are unaffected

---

[9] In relevant part, 11 U.S.C. § 363(e) is as follows:

> Notwithstanding any other provision of this section, at any time,
> on request of an entity that has an interest in property . . .
> sold . . . or proposed to be . . . sold . . . by the trustee, the court,
> with or without a hearing, shall prohibit or condition
> such . . . sale . . . as is necessary to provide adequate protection
> of such interest. . .

by the bankruptcy case and its orders.[10]  As a concomitant point, Prime contests Hudson's

reliance on the doctrines of *res judicata* and collateral estoppel, arguing *inter alia* that those

claims were never at issue in this court and, most articulated, that Prime was not a party to the

sale proceeding.  This court agrees with Prime's position that *res judicata* and collateral estoppel

do not apply to this dispute.  *See also* Point III, *infra*.  This conclusion, however, does not end

the inquiry into the effect of the § 363 sale on Prime's claims.  That inquiry requires examining

the scope of "interests," as that term is used in § 363(f).

It is clear that "interests" *developed prepetition* which would nevertheless affect the "free

and clear" aspects of asset transfers in a § 363(b) sale in bankruptcy are regularly impacted by

such sales.  Section 363(e) and (f) protections are available to holders of affected interests where

such holders have notice of a pending "free and clear" sale.  *See* Point III, *infra*.  Proposed sales

"free and clear of any interest in such property of an entity other than the estate," § 363(f), would

have little functional value if interests created prepetition were not to be affected.  Hence, it is

not the timeline that controls (as Prime advocates), but rather the nature of the interest at issue.

(And, in any event, notwithstanding Prime protestations to the contrary its claims did *not* mature

completely prepetition, given that they complain of a "forced" Chapter 11 filing and inadequacy

of the § 363 sale.)

The Bankruptcy Code does not define the scope of the sale-affected interests, though the

term must be subject to certain limitations.  *See, e.g., Folger Adam Sec., Inc. v.*

*DeMatteis/MacGregor, JV*, 209 F.3d 252 (3d Cir. 2000) (excluding defenses or recoupment

---

[10] Prime asserts in the State litigation that Hudson continued its misdeeds as to other medical institutions, *after* the Christ Hospital asset sale closing of July 2012.  Those claims appear to be embodied in counts dismissed (without prejudice) in the State litigation (i.e., not included in what this court denominates "remaining active claims").  In any event, this court's focus is on Counts Three, Four and Five as they are limited to the sale of assets of Christ Hospital, and not as a predicate to other possible causes of action linked to post-sale closing developments pertaining to any other hospital.

rights from the § 363(f) term "interests").

> Courts have struggled to define the scope of "interest" for purposes of section 363(f).  Although some courts have limited the term to *in rem* interests in the property, the trend seems to be in favor of a broader definition that encompasses other obligations that may flow from ownership of the property.

3 COLLIER ON BANKRUPTCY, ¶ 363.06[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) at pp. 363-47 and 48 (footnotes omitted) (hereinafter "COLLIER").  The broadening trend in the law is reflected in the oft-cited 1996 Fourth Circuit case of *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, *cert. denied*, 520 U.S. 1118 (1997).  There, the purchaser in bankruptcy acquired assets "free and clear" of "successor in interest" liability per the Coal Act (26 U.S.C. §§ 9701-9722).  The court emphasized the relationship between the avoided liability and "the use to which [the purchaser] put their assets," as bringing the Coal Act liability within the purview of § 363(f).  99 F.3d at 582.

The Third Circuit opinion in *In re Trans World Airlines, Inc.*, 322 F.3d 283 (2003) referred positively to *Leckie* in the evolution of § 363(f) law.  *Folger Adam*, 209 F.3d at 258-61, had distinguished *Leckie*; the *TWA* opinion, in reviewing the *Folger Adam* analysis of *Leckie*, said:

> Importantly, in the course of our review of *Leckie*, we noted that "the term 'any interest' is intended to refer to obligations that are connected to, or arise from, the property being sold." *Folger Adam*, 209 F.3d at 259 (*citing* 3 Collier on Bankruptcy ¶ 363.06([1]).

322 F.3d at 289.  In deeming travel voucher obligations and other EEOC claims arising out of a seller-debtor's disputes with employees to be § 363(f) "interests," the *TWA* court stated:

> Here the Airlines [debtor-seller TWA and purchaser American Airlines] correctly assert that the Travel Voucher and EEOC claims at issue had the same relationship to TWA's assets in the § 363(f) sale, as the employee benefits did to the debtors' assets in *Leckie*. In each case it was the

assets of the debtor which gave rise to the claims. Had TWA not invested in airline assets, which required the employment of the EEOC claimants, those successor liability claims would not have arisen. Furthermore, TWA's investment in commercial aviation is inextricably linked to its employment of the . . . claimants as flight attendants, and its ability to distribute travel vouchers as part of the settlement agreement. While the interests of the EEOC and the [travel voucher holders] in the assets of TWA's bankruptcy estate are not interests in property in the sense that they are not *in rem* interests, the reasoning of *Leckie* and *Folger Adam* suggests that *they are interests in property within the meaning of section 363(f) in the sense that they arise from the property being sold.*[11]

*Id.* at 289-90 (emphasis added).

Defining in functional terms the reach of § 363(f) "interests" requires, of course, case-by-case analysis.[12] As emphasized throughout this opinion, the overarching factor in

---

[11] It is important to distinguish § 363(f) "*interests*" as not requiring *in rem* property status, from § 363 sales which are *in rem proceedings.*

[12] This matter presents itself in the following context which could well be considered, in one or another particular, atypical:

> (i)  The "interests" of which Hudson would take free – Prime's economic tort claims – arose between Hudson and Prime, not as a direct function of the hospital's conduct or that of a hospital "insider" (in that sense Christ Hospital was the "stakeholder" of the assets being at the center of market competition);
>
> (ii)  The Prime-Hudson prepetition competition, by Prime's reckoning, had already caused Prime to terminate its asset purchase agreement before the Chapter 11 petition was filed;
>
> (iii)  Prime was not a bidder at the March 2012 auction sale;
>
> (iv)  The immediate circumstances of the auction sale – i.e., the propriety of the bid procedures, the auction process itself, and the sale approval process – are, *as said by Prime,* not being challenged; and
>
> (v)  Prime's claims are for *damages* (only) arising out of Hudson's alleged economic torts (i.e., that no effort is being made to undo the sale).

As will be demonstrated, these factors do not offset the estopping effect of §§ 363(b) and (f) on Prime's

evaluating Prime's economic tort claims as § 363(f) "interests" is the undeniable linkage – *as*

*Prime has claimed it* – of Prime's asset purchase agreement of December 2011, its purported

"loss" of the benefit of that agreement, the supposed "forcing" of the hospital into bankruptcy,

and the sale of hospital assets at a diminished price to Hudson in a bankruptcy auction.  The

culmination of this chain of events has been the transfer to and use of *hospital assets by Hudson*,

very much in opposition to Prime's goal for the transfer and use of those same assets.[13]  Thus,

Prime's *stated factual* claims "are connected to, or arise from, the property being sold,"

consistent with Third Circuit precedent establishing the scope of § 363(f) interests.  Moreover,

the *legal framework* for Prime's assertions – economic tort law – provides remedies for lost

contractual benefits and expectancies from the enjoyment of property.  As property-related

remedies they have long been recognized in New Jersey as follows:

> In a civilized community which recognizes the right of
> private property among its institutions, the notion is
> intolerable that a man should be protected by the law in the
> enjoyment of property once it is acquired, but left
> unprotected by the law in his efforts to acquire it. The cup
> of Tantalus would be a fitting symbol for such mockery.
>
> [*Brennan v. United Hatters of N.Am. Local 17,* 73 *N.J.L.*
> 729, 742-43, 65 *A.* 165 (E. & A.1906).]

*Quoted in Printing Mart-Morristown v. Sharp Electronics Corp.* 116 N.J. 739, 750 (1989).

Courts have readily barred assertion of economic tort claims (as well as fraud and RICO

claims) as collateral attacks on § 363 sale orders, albeit in contexts that vary from the matter at

---

assertion of its remaining economic tort claims in a collateral attack on the bankruptcy sale.

[13] Prime has pled the following:

> [I]t was clear that Garipalli and Hudson Holdco's intent was to
> make it untenable for Prime Healthcare to continue to buy Christ
> Hospital in order to force it into bankruptcy so that Garipalli
> could purchase the struggling facility for less than what was
> agreed upon between Prime Healthcare and Christ Hospital in
> their APA.  [State litigation complaint ¶ 18.]

bar.  So, certain of this § 363 preclusion precedent has developed pursuant to § 363(m) "good

faith" findings and their effect (not applicable *sub judice)* through the medium of *res judicata* or

collateral estoppel.   Less frequently addressed is the *in rem* character of § 363(b) asset sale

orders and their independent effect as a bar to collateral attack.   Typically, in *Farmland* a

disgruntled would-be but disqualified bidder at a § 363 sale ("GAF") sued in a post-sale

proceeding seeking damages for *tortious interference* with an alleged business expectancy.   The

selling Chapter 11 debtor, the § 363 sale purchaser, and others were named defendants.   No

objection had been raised at the time of the sale to the bid procedure order, form of noticed sale,

or the order approving the sale, which included a finding that the successful bidder was a "good

faith" purchaser per § 363(m).   Yet the tortious interference claim maintained that asset values

far exceeded the sale price (an assertion said to be backed by "new" evidence).   While much of

the opinion focuses on the collateral estoppel bar to this tortious interference claim, the *in rem*

protections of § 363 sales, independent of collateral estoppel, were ultimately stressed.   "Even if

the Court determined that GAF is not bound by collateral estoppel to the Court's earlier findings

that bar GAF's complaint, the Defendants are still immune from GAF's lawsuit under § 363(m)

of the Bankruptcy Code, which provides purchasers (and by the terms of the Sale Order -- the

seller, as well) the same, if not greater, protection from attacks on the propriety of the sale of

assets under § 363 of the Bankruptcy Code."  376 B.R. at 729.

     For other cases barring similar economic tort and tort-like attacks on sale approval orders

where the *in rem* character of the sale was deemed significant if not determinative, *see Regions

Bank v. J.R. Oil Co., LLC,* 387 F.3d 721, 731-32 (8th Cir. 2004) (relied upon extensively by

*Farmland, ibid.*, barring a fraud and conspiracy claim by a prepetition nonparty lender against

insider purchasers and affiliates at a § 363(b) sale given that "[a] bankruptcy sale under . . .

§ 363, free and clear of all liens, is a judgment that is good against the world, not merely against

parties to the proceedings"); *In the Matter of Met-L-Wood Corp.*, 861 F.2d 1012, 1017 (7th Cir. 1988) (Judge Posner's opinion being a fundamental resource for both *Farmland* and *Regions Bank,* articulating bar arising from § 363 *in rem* proceeding, as distinguished from bar via participating party-based *res judicata*, while noting § 363(m)'s inapplicability to the case); *see also Food King, Inc. v. Norkus Enters.,* 2006 WL 3674997 (D.N.J. December 13, 2006) (dismissing losing bidder's tortious interference claim against purchaser at a § 363 sale where that purchaser was controlled by an influential person and board member of an umbrella entity that exercised substantial authority over the plaintiff's business); *cf. FutureSource LLC v. Reuters Ltd*., 312 F.3d 281, 286 (7th Cir. 2002); *In re CHC Indus., Inc.,* 389 B.R. 767, 773 (Bankr. M.D. Fla. 2007).

In sum, Prime's intense prebankruptcy sale efforts are a large part of the fiber of its economic tort claims, claims which transcend the hospital's bankruptcy filing *to become directly attributable to the transfer of assets of Christ Hospital and their use by Hudson*.[14]  Those tort claims, thus qualifying as § 363(f) interests, would *under proper circumstances* be barred by the *in rem* protected sale of hospital property "free and clear."[15]

---

[14]Hudson's purchase and use of the *Christ Hospital assets* has given rise (as Prime sees it) to its displacement in a portion of the New Jersey for-profit hospital marketplace (*contrast* a circumstance where the *nature of assets sold* in bankruptcy was more ordinary and available commercial fare rather than the framework of a functioning acute care medical institution).

[15] Matters in dispute here would have been substantially different if Hudson had not been the successful bidder for and acquirer of Hudson's assets.  Such a circumstance would have, on the one hand, limited the tort allegations to *Prime's loss* (if any) without the countervailing asset acquisition advantage alleged to have been garnered by Hudson, while, on the other hand, removing the array of Hudson's bankruptcy preclusion contentions arising out of the bankruptcy process and orders.  The actuality here, however, is that the transfer to and use by Hudson of hospital assets underpins Prime's economic tort allegations – that is, Prime's claims arise out of Hudson's ultimate use of the hospital's assets.  As such, those claims are § 363(f) "interests."

**III.    REQUIREMENTS OF § 363(f)(2) AND ANY OTHER § 363(b) SALE NOTICE REQUIREMENTS HAVE BEEN SATISFIED; MOREOVER, PRIME HAD THE OPPORTUNITY TO SEEK ADEQUATE PROTECTION OF ITS INTERESTS.**

Prime presses the point that it was not a "party" to the sale proceeding. However, at a more general level Prime would have fit within the rubric of "party in interest" (§ 1109(b)) if it had sought to participate more actively in this Chapter 11 case.[16] And, what is most obvious is that Prime was on notice and could have been nothing but acutely aware of (i) the bankruptcy sale process, and (ii) the proposed terms of the bankruptcy sale of hospital assets which it had so intensely pursued and *contracted to purchase*. The transfer of those assets to its purported tortfeasor was being sanctioned by the court "free and clear" of interests including "claims" as broadly defined in the proposed (and ultimately issued) Sale Approval Order. Prime, *solely aware of its position as a potential tort claimant*, stood by knowingly and without objection, at every stage of the bankruptcy case which affected its claims. The net effect of notice to,[17] knowledge of, and nonobjection by Prime to the fully public bankruptcy sale process is as follows:

> (i)    Prime shall have been deemed to *consent* to the sale of hospital assets "free and clear" of its interest (i.e., tortious

---

[16] The term "party in interest" is seen as a broad and "elastic concept"; *see In re Johns-Manville Corp.*, 36 B.R. 743, 748-49 (Bankr. S.D.N.Y. 1984), cited with approval in *In re Amatex Corp.*, 755 F.2d 1034, 1042, (3d Cir. 1985). While *investors in a creditor* are often denied the § 1109 status, *see, e.g., In re Refco Inc.,* 505 F.3d 109 (2d Cir. 2007), Prime in the immediate case is not only a "backstopping" lender through an existing credit facility, it was intimately involved in prepetition debt restructuring in conjunction with the debtor, and a contracting party to acquire its assets right up to the threshold of bankruptcy. Most significantly, Prime considers itself to be the victim of economic torts whose elements include the hospital's Chapter 11 filing and Hudson's purchase in bankruptcy of the hospital's assets. *See FutureSource,* 312 F.3d at 284 (as to a party in interest "holding a direct financial stake in the outcome of the [bankruptcy] case"). [Citation to COLLIER omitted.] In any event, Prime could have availed itself of rule-based permissive intervention per Fed. R. Bankr. P. 2018(a) if it chose to be heard regarding the sale and Sale Approval Order.

[17] The Notice of Appearance filed by counsel for Prime on February 7, 2012 (within a day of the petition filing), dkt. 30, enabled Prime to keep tabs on the entire case. In fact, the case docket supports the delivery of complete and comprehensive notice of case events/filings to Prime and/or its counsel.

interference and unfair competition claims);

(ii)     Prime shall have waived its rights to § 363(e) adequate protection; and

(iii)    Prime shall have been sufficiently placed on notice to satisfy due process and fairness concerns which might otherwise put in question the propriety of *in rem* proceeding orders issued pursuant to § 363(b) and (f) barring Prime from asserting its claims.

Given adequate notice, failure to object to a § 363 sale has been found to constitute *consent* per § 363(f)(2) to a "free and clear" sale of the nonobjector's interests in property being sold.  *See, e.g.*, *FutureSource,* 312 F.3d at 285; *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994); *In re Elliot*, 94 B.R. 343, 345-46 (Bankr. E.D. Pa. 1988); *compare and contrast* In re *DeCelis,* 349 B.R. 465 (Bankr. E.D. Va. 2006); In *re Roberts*, 249 B.R. 152, 154-57 (Bankr. W.D. Mich. 2000).  Indeed, the Sale Approval Order expressly provided for such consent (¶ P).  Prime's causes of action were thus impacted by the § 363 sale bar.[18]  Though not without enduring controversy, *FutureSource* provides the strongest case for consent based upon failure to object to a free and clear sale under § 363(f)(2).  In that case the following practical point was made:

> It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who *might* have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.
>
> And in any event the order approving a bankruptcy sale is a judicial order and can be attacked collaterally only within the tight limits that Fed.R.Civ.P. 60(b) imposes on

---

[18] For historical perspective, including the equitable power to sell in bankruptcy "free and clear" of liens, *see Van Huffel v. Harkelrode*, 284 U.S. 225, 227-28 (1931).

collateral attacks on civil judgments. FutureSource [an
entity whose interest in a financial database which was
originally the subject of a contract with a bankruptcy
provider] has made no effort to bring itself within those
limits; and now that more than a year has passed since the
order was issued, it is doubtful, to say the least, that
FutureSource could succeed in such a collateral attack.

[312 F.3d at 285–86. (Italics in original, internal citations
omitted).]

What is clear and uncontroversial is that such consent-based bankruptcy sale orders –

even if wrong (despite Judge Posner's view and other ample precedent to the contrary) – are not

subject to collateral attack. Fed. R. Civ. P. 60(b) is the appropriate remedy for relief from such

orders, a remedy not accessed by Prime in this case. *See DeCelis*, 349 B.R. at 470-73; *see also*

*Cummings Props., LLC v. Heidelberg Print Fin. Americas, Inc.,* 2002 WL 1839252 (D. Mass.

August 12, 2002); *cf. In re MMH Auto. Group, LLC*, 385 B.R. 347 (Bankr. S.D. Fla. 2008).[19]

Similarly, any rights to adequate protection of its causes pursuant to § 363(e) were lost to

Prime by virtue of its inaction.

And, most notably, this is not a case where the applicable *in rem-based* orders were

issued by "ambush." The sale orders were not a surprise to Prime given notice to Prime of the

impending bid procedures, auction sale, and the terms of the Sale Approval Order (including the

asset purchase agreement). Prime then became aware, by notice and again without objection, of

the details of the asset sale closing, the Disclosure Statement approval process, and the

---

[19] Again, it must be emphasized: Prime (and only Prime) was in a position to be fully aware of its
economic tort claims against Hudson, completely developed as of the bankruptcy auction sale. (This
point, without more, establishes a stronger case for "consent" by "failure to object" than much of the
pro-consent precedent.) Prime thus had the opportunity to disclose those claims and use them to put in
question the *bona fides* of the sale, though it was well-advised of the § 363(f) jeopardy those claims faced.
Prime likewise remained silent as to the scope of the Sale Approval Order. If Prime had decided that the
order had no effect on its claims and therefore Prime could remain on the sidelines in this case (rather
than taking even the most modest protective step and come forward to "reserve its rights"), that decision
was ill-advised. So, too, was the decision to collaterally attack the Sale Approval Order rather than return
to this court for an interpretation of the order, or per Fed. R. Bankr. P. 9024 (essentially incorporating
Fed. R. Civ. P. 60(b)).

Confirmation Order (with the attached Plan of Liquidation).  However, all of this notice, as well

as knowledge on Prime's part, does not establish a *res judicata* or collateral estoppel bar

impacting on Prime's later litigation.  Indeed, Prime's resistance to such a bar based upon its

failure to participate in the sale process and the absence of any bankruptcy hearing regarding its

tort claims is not without merit.  Prime thus does not suffer the bar advanced by Hudson.[20]  "*But

it is barred.* A proceeding under section 363 is an *in rem* proceeding. It transfers property rights,

and property rights are rights good against the world, *not just against parties to a judgment* or

persons with notice of the proceeding."  *In the Matter of Met-L-Wood*, 861 F.2d at 1017

(emphasis added).

The *in rem* bar here defeats Prime's arguments that its State litigation is not a collateral

attack on bankruptcy court orders because this court "did not hear evidence, consider, or make

findings on [Prime's] claims against [Hudson] for Prime's state court claims."  In addition, the

---

[20] Establishing collateral estoppel (i.e., "issue preclusion") requires that:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding,
> (2) the issue was actually litigated in the prior proceeding,
> (3) the court in the prior proceeding issued a final judgment on the merits,
> (4) the determination of the issue was essential to the prior judgment, and
> (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

*In re Dawson*, 136 N.J. 1, 20-21 (1994) (internal citations and parentheticals omitted).  *See also State v. Gonzalez,* 75 N.J. 181, 189 (1977); *Slowinski v. Valley Nat'l Bank*, 264 N.J. Super. 172, 182-83 (App. Div. 1993).  The New Jersey criteria comport with the rule set forth in the RESTATEMENT OF JUDGMENTS:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982) (Issue Preclusion–General Rule).  *Res judicata* would involve resolution of the *same claim* in the prior proceeding.

actuality of notice *sub judice* fully assured not only consent by failure to object per § 363(f)(2),

but also basic *due process;* and, in terms of fundamental fairness, that notice offsets concerns for

harsh application of *in rem* orders.  *Cf. In the Matter of Met-L-Wood*, 861 F.2d. at 1019.

## IV.   SPECIFIC BANKRUPTCY COURT ORDER PROVISIONS AUTHORIZED THE TRANSFER OF HOSPITAL ASSETS "FREE AND CLEAR" OF PRIME'S ECONOMIC TORT CLAIMS AND EXPRESSLY ENJOINED COLLATERAL ATTACK ON THE SALE.

In addition to satisfying legal requirements (*see* Point II, *supra)* there is no doubt that the

*organic orders* in this case support the proposition that Prime's economic tort causes of actions

were intended to be and are "interests" as that term is used in § 363(f).  First, the Bid Procedure

Order, and then the Sale Approval Order defined the § 363(f) "free and clear" aspects of the

hospital asset sale in the broadest terms.  Asset protection from "liens and claims" is explicit,

applying to "causes of action and claims, to the fullest extent of the law . . . whether arising prior

to, on, or subsequent to the Petition Date" (Sale Approval Order ¶ 5).  Equally explicit is the

protection for the successful sale bidder, who is thoroughly shielded from such causes of action

by reason of the asset transfer (*id*. at ¶ 6).  *See also id.* at ¶¶ S and U.  The Sale Approval Order

is thus a prototypical product of an *in rem* proceeding, providing rights running with the hospital

assets and their transfer.  That broad scope order has been reaffirmed by and through yet another

*in rem* proceeding order, the Confirmation Order.

Coupled with the asset protections of § 363(b) and (f) at and after the point of asset

transfer, the Sale Approval Order *and* Confirmation Order expressly *enjoined* collateral attack on

these ordered protections.  The factual basis for "an injunction against creditors and *third parties*

pursuing the Liens and Claims . . . is [that it is] necessary to induce the Successful Bidder to

close (Sale Approval Order ¶ T, emphasis added).  Implementing this finding are injunctive

orders.  "[P]ersons and entities . . . are forever barred, estopped and *permanently enjoined from*

*asserting . . . Liens and Claims against the Successful Bidder Entities"* (*id*. ¶ 6, emphasis added);

likewise, an enduring injunction was ordered which precludes the "commencing or

continuing . . . any action against the Successful Bidder Entities" as to Liens and Claims (*id.* at

¶ 18).  These injunctive provisions are reaffirmed as if reissued in the Confirmation Order

through the Plan, which provided that "[a]ll injunctions . . . contained in the Sale Order and

[Asset Purchase Agreement] shall remain in full force and effect and binding on all parties and

Creditors" (Plan ¶ 12-2; see also Confirmation Order ¶¶ 43, 44 and 47).

Overall, the comprehensive network of bankruptcy orders both shielded the hospital asset

transfer from "Liens and Claims" – including those of Prime for its remaining economic tort

causes – and enjoined Prime's efforts to enforce those causes in a collateral state court

proceeding.

**V.    PRIME'S ASSERTION IN STATE LITIGATION OF ITS REMAINING ACTIVE
        CLAIMS, THOUGH NOT SEEKING TO SET ASIDE THE SALE OR
        PURPORTEDLY IMPUGN THE AUCTION PROCESS, NEVERTHELESS
        CONFLICTS WITH BANKRUPTCY COURT ORDERS AND IS THUS BARRED;
        THE ADDITIVE EFFECT OF THE "GOOD FAITH" FINDING ON THE
        CURRENT DISPUTE IS SIGNIFICANT.**

Prime's State litigation claims, limited to damages allegedly caused by Hudson's torts,

are nonetheless a collateral attack on bankruptcy court orders and the bankruptcy sale process.

*Farmland* makes the plain point:  "The fact that GAF [the disgruntled losing bidder at the

§ 363(b) sale] does not seek to undo the sale with regard to title is not dispositive; *it is sufficient*

*that the Plaintiff is seeking to undo the economics of the sale by seeking damages against*

*CRLLC [the successful bidder]. . . .*"  376 B.R. at 726 (emphasis added).  Similarly, Judge

Posner's formative opinion, *In the Matter of Met-L-Wood*, 861 F.2d at 1018, instructs as follows:

> [The collateral] suit does not seek to rescind the sale. But
> by seeking heavy damages from the seller, the purchaser,
> [and others who benefitted from the sale], the suit is a
> thinly disguised collateral attack on the judgment
> confirming the sale.

To the same effect, *see generally Regions Bank*, 387 F.3d 721; *Food King,* 2006 WL 3674997;

and, consider the court's reasoning in *In re CHC Indus.*, 389 B.R. at 775 ("By asserting the

[fraud claims for damages in a state court proceeding] . . . the Debtor is attempting to unravel the

economic integrity of the sale, a result which 363(m) of the Bankruptcy Code is intended to

prevent").

As indicated, an attack on the fundamentals of the sale via a damage claim fares no better

than a collateral attack seeking to set aside bankruptcy sales.  Successful § 363 sale bidders'

efforts to develop funds (i.e., capital and loans) to engage in the purchase at auction of, in

particular, any major enterprise should not be exploded by after-the-fact collateral attacks for

damages; this is emphatically the case where a functioning public hospital is the selling-debtor

and the successful bidder commits, as here, to maintain the delivery of acute care hospital

services.

Section 363(b) sales are thus favored with *finality* benefits – protection from reversal

modification on appeal (subject only to a stay pending appeal) – per § 363(m).  Much of the

anticollateral attack precedent, as seen throughout this opinion, is supported by a finding of

"good faith" by the purchaser.  The Sale Approval Order supports the good faith finding in this

case,[21] consistent with the rationale of this Circuit's prominent § 363(m) opinion, *In re Abbotts

Dairies of Pa., Inc.,* 788 F.2d 143 (1986).  The scope of such a finding is not necessarily fixed or

formularized:  is it *limited* to a determination of noncollusion, absence of fraud in the bidding

process or no showing of an attempt to take grossly unfair advantage of other bidders?  (Prime

*sub judice* maintains for motion purposes that it does not assert any of these bases for

questioning the good faith finding; rather Prime argues its disputed point that the torts alleged

---

[21] See Sale Approval Order (¶ K), finding that the "Successful Bidder" is a § 363(m) qualified "purchaser
in good faith"; ¶ L (absence of collusion; arm's length bargaining established); and ¶ 24 (ordering
§ 363(m) protections as to finality of the sale).

were "committed" prepetition.)  Or, in this particular situation does the good faith finding *also*

serve to rebut the substance of the economic tort allegations?  Since Prime directly implicates as

integral components of the pled economic torts the alleged "forced" filing of the hospital's

Chapter 11 petition and the § 363 sale processes (including alleged grossly unfair treatment of

Prime as a prepetition would-be purchaser and a devaluing of the sale assets), in this dispute the

§ 363(m) finding is thoroughly *inconsistent* with Prime's remaining economic tort claims.

Tortious interference per New Jersey's applicable law requires a plaintiff to prove that

the defendant's "actions were malicious in the sense that the harm [complained of] was inflicted

intentionally and without justification or excuse."  *Mandel v. UBS/PaineWebber, Inc.*, 373 N.J.

Super. 55, 79-80 (App. Div. 2004), *cert. denied*, 183 N.J. 213-14 (2005) (quoted with approval in

S*inger v. Beach Trading Co., Inc.,* 379 N.J. Super. 63, 82 (App. Div. 2005)).  *See also Dello*

*Russo v. Nagel,* 358 N.J. Super. 254, 268-69 (App. Div. 2003); *DiMaria Constr. Inc. v.*

*Interarch*, 351 N.J. Super. 558, 567 (App. Div. 2001), *aff'd*, 172 N.J. 182 (2002).[22]  This

bankruptcy court's finding that Hudson was acting as a "good faith" purchaser, under the

circumstances of this case, counters Prime's necessary tort assertion of Hudson's malicious

behavior.  That finding thus becomes another target of Prime's collateral attack; it is in addition

to Prime's affront to the Sale Approval Order's § 363(f) "free and clear" asset transfer.

---

[22] Historically, tortious interference was described as follows:

> An action for tortious interference with a prospective business
> relation protects the right "to pursue one's business, calling or
> occupation free from undue influence or molestation."  *Louis*
> *Kamm, Inc. v. Flink*, 113 N.J.L. 582, 586, 175 A. 62 (E. & A.
> 1934).  What is actionable is "[t]he luring away, by devious,
> improper and unrighteous means, of the customer of another."
> *Ibid.*

*Printing Mart-Morristown*, 116 N.J. at 749

## VI.   THE BANKRUPTCY COURT HAS JURISDICTION TO HEAR AND DECIDE THE HUDSON MOTION AND PROVIDE INJUNCTIVE RELIEF.

Prime puts forth a blunderbuss of contentions, challenging this court's authority to hear (based upon jurisdictional limitations) or hear and determine (based upon lack of court authority) Hudson's motion.  A number of these contentions have already been dealt with in this opinion; however, for the sake of completeness there will be some repetition of points made earlier.[23]

In this regard, much of what is argued by Prime continues to turn a blind eye to the essence of bankruptcy jurisdiction, which "at its core, is *in rem*."  *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 362 (2006); *Gardner v. N.J.*, 329 U.S. 565, 574 (1947).  Property held *in custodia legis* by the courts has traditionally (and logically) been the subject of *in rem* oversight.  *Local Loan Co. v. Hunt*, 292 U.S. 234, 241 (1934); *Isaacs v. Hobbs Tie & Timber Co.*, 282 U.S. 734, 738 (1931).

> A bankruptcy court's *in rem* jurisdiction permits it to "determin[e] all claims that anyone, whether named in the action or not, has to the property or thing in question. The

---

[23] Synopsized, Prime contends:

> Though disguised as a motion to enforce a sale order and confirmation order, what [Hudson] actually seeks is to enjoin Prime Healthcare from litigating its non-derivative state law claims against [Hudson] in any forum - state law claims that were not considered by the Bankruptcy Court, and over which the Bankruptcy Court lacks jurisdiction under Article III. See Stern v. Marshall, 131 S. Ct. 2594 (2011). . . .

> [T]he Bankruptcy Court did not hear evidence or make determinations on the pre- and post-bankruptcy conduct of [Hudson] that forms the basis of Prime['s]  state law claims against [Hudson].  [Hudson's] pre- and post-bankruptcy conduct was not at issue; rather, only [its] separate conduct *in the course of the sale proceedings* was before the Bankruptcy Court.  See In re Abbotts Dairies. . . .Moreover, the Bankruptcy Court had no jurisdiction under Article III of the Constitution or Stern, supra, to enter final judgment on Prime['s] state law claims against [Hudson], nor to grant [Hudson] either a release or permanent injunction from such non-derivative claims.

[Prime's Supplementary Letter Memorandum, Oct. 22, 2013, p.2.]  Labeling these economic tort claims as "non-derivative" without an explanation of any functional impact of such a characterization, ignores again the inseparable linkage of those claims to this Chapter 11 case and sale.

> proceeding is 'one against the world.' " 16 J. Moore, et al.,
> Moore's Federal Practice § 108.70[1], p. 108-106 (3d ed.
> 2004). Because the court's jurisdiction is premised on the
> res, however, a nonparticipating creditor cannot be
> subjected to personal liability.

*Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004) (certain citations omitted).[24]

Notwithstanding the historic and enduring *in rem* character of bankruptcy, in its modern

form *in personam* aspects of cases are adjudicated in the ordinary course by bankruptcy courts.

The nonexclusive listing of "core proceedings," 28 U.S.C. § 157(b)(2), is a blend of matters

which do not readily adhere to any well-defined *in rem – in personam* breakdown.  Most relevant

to this motion are 28 U.S.C. § 157(b)(2)(L) and (N), rendering "core" the following:

> (L)   confirmations of plans; . . .
> (N)   orders approving the sale of property. . . .

These provisions make clear that this case's Sale Approval Order and the Confirmation Order are

"core," and their history and logical scope render them the product of *in rem* aspects of

bankruptcy.  Enforcement motions relating to such orders are likewise "core" and squarely

within this court's jurisdiction to hear and determine.[25]

Discounting the precepts of *in rem* jurisdiction, Prime argues that it did not participate in

the hospital's Chapter 11 case and thus cannot be bound by the organic orders issued in that case.

Similarly, it would argue that Hudson, a nondebtor, cannot avail itself of enforcement rights

against Prime (again, a nonparticipant in the case) through the good offices of the bankruptcy

---

[24] Consistent with *in rem* jurisdiction, only Prime's § 363(f) interests as affected by the § 363 sale are at issue in this dispute; no personal liability of Prime was determined in the sale process (and none is currently at issue in this enforcement motion).

[25] This court's jurisdiction is derived from 28 U.S.C. § 1334(b) and this District's Standing Orders of Reference of July 23, 1984 and September 12, 2012.  This matter is "core," emanating from 28 U.S.C. § 157(b)(2)(L) and (N), now presented as a motion to enforce terms of the § 363 Sale Approval Order and the Confirmation Order.  This matter "arises under title 11" (§ 363 and the statutory confirmation process), and "arises in" a case under title 11 (that is, the collateral attack on this court's orders undertaken during the pendency of this Chapter 11 case).

court.[26]  These contentions ignore an essential point in this dispute: once Hudson became the

successful auction bidder, the asset transfer, the assets and their use by Hudson garnered

protections under the Sale Approval Order *which are within the jurisdiction of this court to*

*provide and which are enforceable in bankruptcy against Prime.*

*Inter alia,* Prime continues to premise its position on the supposed necessity of a

bankruptcy hearing on Hudson's conduct relative to Prime, a purported prerequisite to barring

Prime's claims through the § 363 sale process.  Yet, it was *only* Prime who was able to formulate

and disclose that conduct and those claims at the time of the sale.  Prime chose to remain silent

then and only later would collaterally attack the sale process during the pendency of the Chapter

11 case as if its silence and purported nonparticipation in the case shields it from this court's

asset sale-based jurisdiction.  To allow such a practice would introduce damaging uncertainty

into § 363 sales, with resulting impact on the economics of such sale.[27]

As noted earlier and throughout, *Prime has defined* its economic tort claims in terms of

Hudson's conduct and intent: that is, to render Prime's potential as a buyer of hospital assets

untenable, force Christ Hospital into bankruptcy, and then take advantage of the bankruptcy sale

---

[26] For a full exposition of a *post-confirmation* dispute between two nondebtors involving interpretation
and enforcement of a bankruptcy court sale order, *see In re Hereford Biofuels, L.P.*, 466 B.R. 841 (Bankr.
N.D. Tex. 2012).  "Core," "arising in" jurisdiction was found, as was the bar to collateral attack based
upon *in rem* concepts, with substantial reliance on *In re Met-L-Wood Corp*, 861 F.2d at 1016-19.  (Note
that *sub judice*, the Chapter 11 case remains active and that the State litigation was initiated
preconfirmation.)

[27] Prime would turn the *in rem* aspect of the bankruptcy sale on its head.  A § 363 sale serves to transfer
of property rights "good against the world," not just against parties to a judgment or persons with notice
of the sale hearing.  *Matter of Met-L-Wood*, 861 F.2d at 1017.  Of course, in the immediate matter the
most specific actual notice of sale terms were provided to a knowing suitor.  *Compare In re MMH Auto.
Group,* 385 B.R. at 357 ("The law is clear that an entity that holds or asserts an interest in a property the
trustee seeks to sell is entitled to receive notice of the trustee's intent to sell that property, particularly
when the trustee seeks to sell the property free and clear of that entity's interest. . . . However, a party
whose interest is hidden, whether by design or failure to do what is necessary to protect or disclose such
interest, cannot complain that its interest has been compromised without notice, because, logically, the
trustee cannot be expected to know that a 'hidden' interest exists.") (Citations omitted.)

process to acquire the assets at a lesser price than Prime's prebankruptcy contract price.  The

assets, upon transfer, would position Hudson to operate a fully functioning hospital in the

marketplace which Prime had staked out prepetition (only to be denied by Hudson and through

the processes of this Chapter 11 case).   There is thus a clear factual connection between the

specifics of these economic tort claims and the bankruptcy sale of the hospital assets per § 363(b)

and (f).  The claims are § 363(f) "interests," subject historically in bankruptcy to being affected

by a "free and clear" sale.[28]  Moreover, the applicable law (that of New Jersey) has long

recognized these particular economic torts as *property protection*.[29]

Once the Christ Hospital assets were brought under the control of this court, bankruptcy

jurisdiction (including traditional *in rem* jurisdiction) was implicated.  That jurisdiction, in turn,

was exercised in the necessarily fast-moving process of selling the essence of a functioning but

financially desperate hospital to an auction-bidding purchaser.  Substantial bankruptcy policy

supports quickly organized and effectuated § 363 sales; *sub judice*, a true community emergency

– the potential loss of Christ Hospital to its service area – was reflected in this Chapter 11 case.

Prime had been the major suitor for hospital assets, was a contract party for them, and an

enabling lender to keep the hospital from closing while sale and regulatory requirements could

be dealt with.   Prime then "lost" its contract-party position, terminating its asset purchase

agreement, *appeared by Notice in the Chapter 11 case*, and awaited repayment of its $6 million

loan (through HFG) upon closing.  It did not bid for the assets; rather, Prime remained as a

relatively passive observer, receiving notice of sale and confirmation processes and *proposed*

*implementing orders* which broadly enjoined recourse against the successful auction buyer, the

purported tortfeasor, Hudson, and went further to find that Hudson was a § 363(m) "good faith

---

[28] *See Van Huffel*, 284 U.S. at 227-28.

[29] *See Printing Mart-Morristown,* 116 N.J. at 750.

purchaser" at the sale.

Now, Prime contests the Sale Approval Order, and the Confirmation Order as they would apply to its remaining active economic tort claims.  Its challenge is generally jurisdiction-based (and is not couched in "Relief from Judgment or Order" terms of Fed. R. Bankr. P. 9024, the Fed. R. Civ. P. 60 equivalent). [30]  Such a tactic is contrary to basic bankruptcy policy (including the need for finality of sales), and misconceives traditional bankruptcy jurisdiction.

It should be clear, contrary to Prime's argument, that the *in rem* bar here is *not* a resolution of state law claims, nor is such a resolution necessary to decide the pending motion. That bar is an estoppel; it is based upon bankruptcy sale/marketplace necessities and, in this case Prime's conduct as well.  Similarly, Prime's contentions that *its* economic tort claims do not "arise under title 11" or "arise in a case under title 11," and are thus not derived from the debtor or the bankruptcy case or law, misses the point that those claims are § 363(f) interests.  *It is the*

---

[30] However, more narrowly, *Prime* reads the Sale Approval Order ¶ 15 as limiting this court's role in enforcing the order's provisions and those of the incorporated asset purchase agreement.  In fact, that provision is extensive and contemplates both enforcement and interpretation which well cover the current dispute.  The Sale Approval Order, ¶ 15, is as follows:

> 15.  This Court shall retain exclusive jurisdiction to enforce the provisions of this Order and the Purchase Agreement, and to resolve any dispute concerning this Order, the Purchase Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Purchase Agreement and this Order, including, but not limited to, interpretation of the terms, conditions and provisions thereof, and the status, nature and extent of the Assets, and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Assets free and clear of the Liens and Claims.

Prime fails to address Order ¶¶ 6 and 18, which even more comprehensively protect via injunction the successful auction bidder.  *See* Order ¶ 6 ("persons and entities . . . are forever barred, estopped, and *permanently enjoined from asserting* . . . *Liens and Claims against the Successful Bidder Entities*") and ¶ 18 ("[e]ffective on the Closing Date . . . [those] . . . asserting Liens and Claims . . . against the Debtor and/or any of the Assets are hereby *permanently enjoined and precluded*" as to such Liens and Claims from "*commencing or continuing . . . any action against the Successful Bidder Entities*").  (Emphasis added.)

*bankruptcy sale (including order enforcement) which is "core" here, not resolution of the economic tort claims alleged by Prime.*

Prime invokes *Stern v. Marshall*, _____ U.S. _____, 131 S. Ct. 2594 (2011) but fails to relate it specifically to § 363 sales, *in rem* bankruptcy jurisdiction, or anything factually analogous to the matter at bar.

In the final analysis of jurisdictional matters here, Prime is in the position of an "interest" holder for § 363(f) purposes.  Prime had complete notice and knowledge of the bankruptcy case and the § 363 sale.  It took no steps to protect its interests in the Chapter 11 case (notwithstanding multiple opportunities).  Further, Prime chose to collaterally attack the Sale Approval Order and, ultimately, the Confirmation Order while this case was ongoing.  The State litigation pleading was filed in March 2013, seeking bankruptcy-sale affecting damages at a preconfirmation stage of the Chapter 11 case.  *Stern v. Marshall*, restricting under certain circumstances bankruptcy courts from adjudicating state law-based counterclaims as part of bankruptcy adversary proceedings, does not unsettle the scope of traditional bankruptcy processes.  There is absolutely no reason to believe that "free and clear" sales are suddenly outside the ambit of the bankruptcy court.  If in particular cases *due process* issues arise based upon notice and fundamental fairness concepts (put at risk in sanctifying and enforcing the terms of bankruptcy sales), those concerns can be addressed where raised.  However, in the case at bar there is no such notice or fairness impediment to the enforcement of the Sale Approval Order and

the Confirmation Order.[31]

This bankruptcy court here asserts its historic and time-honored jurisdiction to interpret

and enforce its own prior orders.  *Local Loan Co. v. Hunt*, 292 U.S. at 239.  In doing so, it is

concluded that the dispute before this court is within its jurisdiction to hear and decide; it is a

core proceeding, principally arising under title 11 pursuant to § 363 sale processes.  In aid of

existing injunctions issued during the pendency of this case, an injunctive order is called for

barring collateral attack on the bankruptcy sale process and organic court orders.[32]

## VII.   INJUNCTION, CONSISTENT WITH THE ALL WRITS ACT AND THE ANTI-INJUNCTION ACT AND NOT PREEMPTED BY THE STATE COURT ORDER OR OPINION, SHOULD BE ISSUED BY THIS COURT.

This court has issued, as part of the March 27, 2012 Sale Approval Order and the June 4,

2013 Confirmation Order, a related series of injunctions which bar collateral attack on the § 363

sale of hospital assets.  The current motion calls for interpretation and enforcement of those

---

[31] Prime relies on *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 153 n.6 (2009), said to permit in "rare situations" collateral attack on previously determined or nonchallenged subject matter jurisdiction.  In fact, the Court did not adopt (or reject) this exceptional standard.  In any event, such a "rare situation" does not exist here; this case involves a normal course § 363 sale, albeit on an emergency basis and as an effort to save an important community institution.  If anything, in a narrowly drawn holding *Travelers* supports at least the *finality* of a confirmation order based injunction, serving as a bar against further litigation of certain nonderivative claims.  *Id.* at 154-55.

[32] Fed. R. Bankr. P. 7001(7) requires a party to file an adversary proceeding "to obtain an injunction or other equitable relief, *except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief*" (emphasis added).  This rule was amended effective December 1, 1999 to add the highlighted language, "to make it clear tha[t] an adversary proceeding is *not* necessary to obtain injunctive or other equitable relief *that is provided for in a plan* when substantive law permits such relief."  *In re Bryant*, 296 B.R. 516, 520 (Bankr. D. Colo. 2003) (emphases in original); Fed. R. Bankr. P. 7001 (West 2006) (Advisory Committee Notes).  The court in *In re Continental Airlines, Inc.*, 236 B.R. 318, 326-27 (Bankr. D. Del. June 28, 1999), *aff'd* 2000 WL 1425751 (D. Del. September 12, 2000), *aff'd* 279 F.3d 226 (3d Cir.), *cert. denied*, 537 U.S. 944 (2002), interpreting the text of Fed. R. Bankr. P. 7001(7) as it existed *before* December 1, 1999, concluded, even without the amended language that, where the debtor did not seek "to *obtain* an injunction" but "merely . . . to enforce an injunction already in place—that created by sections 1141 and 524 of the Bankruptcy Code and the express terms of the Confirmation Order," an adversary proceeding is not required (emphasis in original).  *Accord In re Kalikow*, 602 F.3d 82, 93 (2d Cir. 2010).   Motion practice is thus justified in the instant case.  *See* Sale Approval Order, ¶¶ 6 and 18, and the reaffirming of these injunctions per Plan of Orderly Liquidation, ¶ 12.2, and  Confirmation Order, *Findings of Fact, Conclusions of Law and Order Confirming Joint Plan of Orderly Liquidation*, ¶¶ 43, 44 and 77.

orders, not newly minted injunctions.  The State litigation, at the pleading stage, included a

review and interpretation of those orders; now, back before the issuing court on the immediate

motions, the question of impact of the State action on this motion should be addressed.  In fact,

there is no effort by this bankruptcy court to exercise appellate jurisdiction over State court

orders or judgments.  Rather, this court is called upon to implement its preexisting orders.

Hence, the *Rooker-Feldman* doctrine has no application here.[33]

      The Anti-Injunction Act (28 U.S.C. § 2283)[34] is applicable here.  However, it does not

---

[33] *See Exxon Mobil Corp. v. Saudi Basic Indus.*, 544 U.S. 280 (2005), limiting the doctrine as follows:

> The *Rooker-Feldman* doctrine, we hold today, is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.  *Rooker-Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions. . . .  [*Id.* at 284.]

> When there is parallel state and federal litigation, *Rooker-Feldman* is not triggered simply by the entry of judgment in state court.  This Court has repeatedly held that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." . . . Comity or abstention doctrines, may in various circumstances, permit or require the federal court to stay or dismiss the federal action in favor of the state-court litigation. . . .  [*Id.* at 292 (internal citations omitted).]

> But neither *Rooker* nor *Feldman* supports the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or related question while the case remains *sub judice* in a federal court. . . . [*Id.* at 292 (internal citations omitted).]

[34] 28 U.S.C. § 2283.  Stay of State Court Proceedings.

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

require the bankruptcy court to permit its preexisting injunctive orders (and other orders) to be

collaterally attacked.  Rather, this court is authorized to grant Hudson's motion enjoining state

court proceedings so as "to protect or effectuate [this court's] judgments."  Such an injunction is

thoroughly supported by the All Writs Act, 28 U.S.C. § 1651.[35]  *See generally, In re Prudential*

*Ins. Co. of Am. Sales Practice Litigation*, 261 F.3d 355 (3d Cir. 2001).  And, in terms of

Bankruptcy Code underpinning, *see* 11 U.S.C. § 105(a).[36]

      Still to be determined is the *scope of this court's injunction of the State litigation*.  A

review of the State complaint makes it clear that Prime has attempted to combine claims

pertaining to its efforts to purchase the assets of other hospitals, as well as those of Christ

Hospital.  However, it is also quite clear (and was to the Superior Court judge) that economic tort

claims concerned with Christ Hospital are freestanding and would (and, in fact, did) survive as

claims even when the allegations relating to the other hospitals were excised from the litigation.

      More specifically, the State complaint ties in Hudson's purported anticompetitive

behavior as to Christ Hospital with marketplace manipulation impacting on Prime's efforts to

acquire St. Michael's, St. Mary's and a Rhode Island hospital.  (Again, as to those other

hospitals, the complaint has been dismissed *without prejudice* at the pleading stage.)  Hudson's

---

[35] 28 U.S.C. § 1651.  Writs.

> (a)  The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law

[36] 11 U.S.C. § 105.  Power of court

> (a)  The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

Christ Hospital-related conduct exhibited, as Prime sees it, a "modus operandi" later applied to these other hospitals.  This court will only issue an injunction which is tailored to cover the collateral attack on Christ Hospital orders, not more general restrictions on the State litigation (if it should be regenerated as to hospitals other than Christ Hospital).  Hence, Prime and the State litigation should be enjoined *only* to the extent that relief is sought for the loss of the purported benefits to Prime from the Christ Hospital deal that was said to have been scuttled by Hudson.  Whether Hudson's "methods" or a continuum of its conduct should bear on other hospital deals is beyond the scope of this court's original injunctive orders and that which will issue now.[37]

## VIII.   CONCLUSION.

A.  Prime's remaining economic tort claims are purported obligations of Hudson which "are connected to or arise from" the § 363 sale of assets and their use by Hudson as the successful bankruptcy sale bidder.   They are thus "interests" per § 363(f), and as such, are subject to a § 363 sale "free and clear" of them.

B.  Prime had complete notice and knowledge of the terms of the § 363(b) sale of hospital assets but did not object to the sale or apply for any adequate protection of its interests.  Those interests, as fully manifested asset-related claims, were exclusively within the ken and control of Prime.  Under these circumstances, Prime's failure to object to the asset sale "free and clear" of its interests is properly considered consent to the auction sale on that basis pursuant to § 363(f)(2).

C.  This court's Sale Approval Order, later reaffirmed by the Confirmation Order, explicitly authorized the "free and clear' asset sale and enjoined collateral attack on that sale.

---

[37] It is understood that Prime might well have kept its Christ Hospital grievances out of court, but for the subsequent competition to acquire other hospital assets; this tactical or causative point is not relevant. Prime (by its pleading) held established economic tort claims ultimately pressed against Hudson which are limited to the Christ Hospital transaction (including components which transcend the petition filing in this case and its § 363 asset sale).

Yet Prime chose to eschew any application to the bankruptcy court for relief (whether per Fed.

R. Bankr. P. 9024 or otherwise), and went forward during the pendency of this case (indeed,

preconfirmation) with the State litigation which, in fact, was such a collateral attack.

  D.  Prime's would-be State litigation remedy – damages from Hudson – presents a frontal

attack on the economic integrity of the § 363(b) sale, and is thus no less a collateral attack than

one which seeks to set aside that sale.  Prime also attacks through the State litigation the "good

faith" purchase finding of the Sale Approval Order.

  E.  This court's jurisdiction to interpret and enforce its sale and confirmation orders is

historic and unimpeded by *Stern v. Marshall* or other recent developments in the law.  Moreover,

the *in rem* aspect of § 363(b) sales remains unaltered by currently debated jurisdiction issues.

"Arising under," "arising in" and "core" requirements of 28 U.S.C. §§ 1334(b) and 157(b)(2)(L)

and (N) are well satisfied.  In addition, full and complete notice of the terms of sale was provided

to Prime, thereby satisfying basic due process and fundamental fairness concerns; and, Prime

(and only Prime) held the key to the existence at the time of the § 363(b) sale of its later

advanced economic tort claims.  Prime:  failed to disclose its claims; allowed the bankruptcy sale

to proceed under the assumption that the purchaser would take "free and clear" of such interests;

collaterally attacked the sale contrary to the Sale Approval Order injunctive provisions; never

sought recourse in this court, per Fed. R. Bankr. P. 9024 or otherwise, notwithstanding the active

pendency of this Chapter 11 case; and, now attempts to fend off bankruptcy court enforcement

on jurisdictional grounds.  Such tactics should not be permitted.

  F.  This court is authorized to issue an injunction under the circumstances of this case.  In

fact, a current injunction would be in aid of preexisting injunctions embodied in the Sale

Approval Order and the Confirmation Order.  No Anti-Injunction Act restrictions have

application here; the All Writs Act and 11 U.S.C. § 105(a) enable the injunctive process in this

case.  Of course, the injunction should be limited to the collateral attack in the State litigation to

those counts (the remaining active claims) which seek damages for economic torts said to have

been committed by Hudson in connection with its § 363(b) purchase of hospital assets.  The

determination of the State Court (August 22, 2013) which would interpret, at the pleading stage

of the State litigation, preexisting bankruptcy court orders during the pendency of this

bankruptcy case, is not binding on this court, nor does it preempt Hudson's application here.

     G.  Hudson's motion for injunctive relief is granted.  The court will issue its

implementing order.


Dated: 12/3/2013                                    /s/Morris Stern_____
                                                   MORRIS STERN, U.S.B.J.